IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL P., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE DOWNINGTOWN AREA | : | |
| SCHOOL DISTRICT | : | NO. 07-4363 |

**MEMORANDUM**

Ditter, J.                                                                                                       October 3, 2011

In this case, it is contended that the Downingtown Area School District failed to provide an appropriate education to Daniel P., a child with learning disabilities, that his parents were justified in placing him in a private school, and that they are entitled to be reimbursed for their tuition expenses pursuant to the Individuals with Disabilities Education Act ("IDEA"). It comes before me on cross-motions for judgment on the administrative record. The hearing officer found in favor of the plaintiffs, but was reversed by the appeals panel. The primary issues of fact in this case concern the timeliness of the District's identification of Daniel as eligible for special education services, whether the proposed Individualized Education Program ("IEP") was appropriate to meet his needs, and whether he meets the exception to the notice requirement for tuition reimbursement. For the reasons that follow, I will grant the District's motion and uphold the decision of the appeals panel.

**I.  FACTS AND PROCEDURAL HISTORY**

Daniel first became a student of the District in the 2003-2004 school year when he began kindergarten at West Bradford Elementary. During kindergarten, he received informal remedial interventions in the regular classroom setting four days each week that included an extra half-

hour of instruction on listening and following directions.

In first grade (the 2004-2005 academic year), an Instructional Support Team ("IST") was assigned to Daniel to provide additional interventions in reading four days per week. Early that year, Daniel was diagnosed with Attention Deficit Disorder ("ADD"). His parents advised the school of this diagnosis and requested a multi-disciplinary evaluation pursuant to the IDEA to determine Daniel's eligibility for special education services. An evaluation report was issued in December 2004 ("first evaluation") and concluded that Daniel had a specific learning disability in reading, noting a severe discrepancy between Daniel's cognitive ability and his reading comprehension. It was further determined that his needs were being adequately addressed through the IST interventions he was receiving in the regular classroom setting. The report stated that Daniel's progress was to be closely monitored and further evaluation was a possibility if his needs were not being met in the regular classroom setting.

In second grade (the 2005-2006 academic year), Daniel continued to receive interventions through the IST program. He continued to exhibit academic difficulties and he was increasingly frustrated and anxious about school.

In September 2006, at the start of his third-grade year, Daniel's parents obtained an independent educational evaluation. The resulting September 25, 2006 report showed Daniel's academic achievement was falling behind that expected of him and noted a delay in his reading, math, and writing skills. The school district also evaluated Daniel at that time and the District's September 26, 2006 evaluation report ("second evaluation") concluded that he had a specific learning disability and was eligible for special education under the IDEA because of his deficits in reading, math, and writing.

The school district therefore scheduled an IEP meeting with Daniel's parents to discuss its proposed IEP for Daniel. On October 13, 2006, prior to that meeting, Daniel's parents withdrew Daniel from the District, without notice to or approval by the District, and enrolled Daniel in Woodlynde School, a private school that provides educational programming to children with disabilities. Nonetheless, the IEP meeting took place on October 25, 2006. Daniel's parents attended and requested a due process hearing, seeking tuition reimbursement for enrolling Daniel in private school and compensatory education for the District's decision not to provide special education following the first evaluation in December 2004.

The due process hearing was conducted in April and May of 2007 and the hearing officer issued her decision on June 2, 2007.[1] The District argued that its decision in the first evaluation was correct and that the parents could not receive tuition reimbursement because the IEP it offered was appropriate and the parents failed to comply with the IDEA notice requirement. However, the hearing officer found that the District failed to timely identify Daniel as eligible for special education under the IDEA, that the district's proposed IEP was not appropriate, and that Daniel's parents were entitled to compensatory education and tuition reimbursement because they met the exception to the notice requirement.

The District appealed and the Pennsylvania Special Education Appeals Panel found in its favor, reversing the hearing officer. The appeals panel found that the District timely identified Daniel as having a specific learning disability in September 2006 and the IEP was appropriate, and denied tuition reimbursement, noting that Daniel's parents failed to follow the required notice provisions.

---

[1] I reference this opinion as "Carroll Op."

The plaintiffs appealed to this court pursuant to the IDEA's judicial review provisions which permit me to review the administrative record, in addition to the hearing officer and appeals panel opinions, and to base my decision on the record.  20 U.S.C. § 1415(j).

## II. DISCUSSION

### A. Applicable Law

The IDEA defines a "child with a disability" as a child who has a specific disability such as Daniel's "*and who, by reason thereof,* needs special education and related services." 20 U.S.C. § 1401(3)(A) (emphasis added).  The Pennsylvania State Board of Education, since 1999, has required school districts, including Downingtown, to develop plans "for additional instructional opportunities for students not achieving at the proficient level, including identification procedures, alternate instructional strategies, monitoring of assessment procedures, and opportunities for extended learning time." 22 Pa. Code § 4.13(c)(11).

Prior to July 2005, the IDEA stated that a child needed special education and related services when "the child does not achieve commensurate with his or her age ability levels" if he or she was "provided with learning experiences appropriate for the child's age and ability levels." 34 C.F.R. § 300.541(a)(1) (2005).  The United States Department of Education ("DOE"), in its implementing regulations, had required a "severe discrepancy" between academic achievement and intellectual ability as the means to identify a child in need of special education services.  These regulations were in place at the time of Daniel's first evaluation in December 2004.

The IDEA was revised effective July 1, 2005, to modify the language defining a need for such services where the child "does not achieve adequately for the child's age or to meet State-approved grade level standards . . . when provided with learning experiences *and instruction*

4

appropriate of the child's age *or State-approved grade-level standards*." 34 C.F.R. § 300.309(a)(1) (2007) (emphasis added to show revisions). The process now utilized under the revised IDEA is referred to as "response to intervention" or "RtI model." *See e.g, Michael P. v. Dep't of Educ.,* No. 09-16078, 2011 U.S. App. LEXIS 18616, *8 (9th Cir. Sept. 8, 2011) (noting the revised IDEA "regulations prohibit states from requiring school districts to use the 'severe discrepancy model' and compel states to allow school districts to use the 'response to intervention model'"). In other words, the revised IDEA forbids a state from mandating a severe discrepancy model, but still allows the use the severe discrepancy model in addition to permitting the use of an RtI model.

### B. Standard of Review and Burden of Proof

In reversing the hearing officer's decision, the appeals panel exercises plenary review "except that they should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995).

I apply the "modified de novo" review set forth by the Third Circuit and will "give 'due weight' to the appeals panel's decision of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." *Id.* As the Third Circuit has noted, "[t]here is a reason for insisting on administrative review and the heightened level of deference accorded to its results: judicial review is 'by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *R.R. v. Manheim Twp.*

*Sch. Dist.*, 412 Fed. Appx. 544, 549 (3d Cir. 2011).  *See also, Davis v. Wappingers Cent. Sch. Dist.*, 2011 U.S. App. LEXIS 11262, *3 (2d Cir. June 3, 2011) (requiring the court "'give due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'").

### C.  Free and Appropriate Public Education

As I noted in my January 21, 2010 order, the IDEA imposes a duty on the District to demonstrate that all children with qualifying disabilities are identified and evaluated.  20 U.S.C. § 1412(a)(3).  Children who are suspected of having a qualifying disability must be identified and evaluated within a reasonable time after school officials are on notice of behavior likely to indicate a disability.  *Ridgewood Bd. of Educ. v. M.E*, 172 F.3d 238, 253 (3d Cir. 1999).  In assessing whether the District timely identified Daniel as IDEA eligible, I consider the Third Circuit's warning that "after-acquired evidence, such as information received through the experience of an alternative placement, should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all."  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. Pa. 1995).

To ensure a FAPE, the school district must provide an education tailored to the unique needs of the disabled child through the development and implementation of an appropriate IEP.  *Id.* at 247; 20 U.S.C. § 1412(a)(4).  The IEP must provide "significant learning" and confer "meaningful benefits."  *Id.*  "[T]he school district bears the burden of proving the appropriateness of the IEP it has proposed."  *Carlisle Area Sch.*, 62 F.3d at 533.

### 1. Timely Identification of Daniel as IDEA Eligible

The hearing officer found:

> [The District] erred in concluding that Daniel was not eligible for special education services [in December 2004] based, in part, upon the private, Parent-funded educational services supplementing the IST interventions he received in the regular education classroom. The District should have realized that Daniel's need for signifcant services in addition to the regular education classroom supports it was providing indicated his need for special education services *even if he was making appropriate progress* with the combined efforts of the IST process and the tutoring.

Carroll Op. at 9-10 (emphasis added).

The appeals panel disagreed, finding:

> The District relied on the IST program provided to [Daniel]. The assessments determined [Daniel] made progress in the program until the third semester of the second grade, at which time the IST recommended a re-evaluation. The District completed that evaluation in September of 2006 at which time the District concluded the Student was in need of special education services. The District relied on "response to intervention" model of assessment . . . [which] "is a process in which a district identifies an at-risk student and monitors progress to determine if the student shows adequate growth after receiving high quality evidence based instruction in the area."

Appeals Panel Op. at 6-7 (citations omitted).

The panel therefore reversed the hearing officer, holding that "what [the District] knew as of December 2004[] was that [Daniel] was functioning at or above expectations for [his] ability, age, and grade level in all areas except reading comprehension. [Daniel] was in the IST program to which [he] responded until the third semester of the second grade. The Parents offered no evidence to the contrary as to the progress made to the response to intervention assessments." *Id.* at 8. I find the record supports the appeals panel's finding.

Daniel argues that the IST model was inadequate. His expert, Dr. Margaret Kay, asserted

7

that "a true RTI intervention process would have likely been extremely effective for Daniel P. had it been implemented in Kindergarten as intended, [but] the core characteristics of Pennsylvania's RTI model were never implemented by the Downingtown Area School District in this case." Report of Dr. Margaret J. Kay at 24.  However, on that very same page of her report, Dr. Kay concedes that "the core characteristics of Pennsylvania's RTI model *did not exist* when Daniel was in kindergarten, first or second grades." *Id.* (emphasis added).

Furthermore, she cites Daniel's 2004 and 2006 evaluations as "indicat[ing] that Daniel was falling farther and farther behind others of his age and grade academically and was making trivial rather than meaningful progress, even with the outside tutorial supports that were being provided by his parents." *Id.* at 28.  Notably, however, Dr. Kay does not cite to any test scores prior to the second evaluation as showing this deterioration in Daniel's progress that would have caused the District to recognize Daniel's need for special education services any sooner than it did – immediately after the second evaluation.

Daniel also cites to his report cards as indicating his decline, but the hearing officer found that "Daniel's increasing academic struggles were *not* well reflected in his second grade end of the year report card, although a comparison of Daniel's first and second grade report cards show fewer skill areas in which he was judged proficient."  Carroll Op. at 4 (emphasis added).

Finally, the hearing officer's opinion focused on the District's reliance on the parent-provided tutoring to justify its decision that Daniel did not need additional services from the District itself.  The appeals panel addressed this contention directly and disagreed, noting that the parent conceded the tutoring provided did not meet the minimum levels required and was not articulated with Daniel's in-school reading program.  Appeals Panel Op. at 6.

The panel, pointing to the evaluations in September 2006, further found that "neither of the District's evaluations nor the [independent educational evaluation] mentions nor acknowledges reliance upon[] this minimal level of tutoring." *Id.*  It is true, as the plaintiffs point out, that the District's initial evaluation does note, in three pages of single-spaced text, that Daniel was receiving interventions "both in school and privately."  Plfs' Mot. at 16, n.3.  This does not, however, contradict the appeals panel's conclusion that the District did not rely on this minimal level of tutoring in assessing Daniel's progress and eligibility for special education services.  Indeed, when read in context, it is clear that, as the appeals panel found, the District instead relied on the IST program.

> Daniel's Instructional Support Teacher reports that Daniel is working in a small group with appropriate materials through IST, is making progress in that group, and has a peer group at a similar instructional level.  Given Daniel's low average verbal comprehension ability found on the [Wechsler Intelligence Scale for Children Fourth Edition], in combination with the interventions he is receiving both in school and privately, his performance makes sense.  Daniel is picking up some basic reading skills with interventions in place and obtained a score within the average range overall.

Initial Evaluation Report at 5.

Applying deference to the decision of the appeals panel, there is simply no basis for concluding that the District should have acted sooner than it did in determining that Daniel was eligible for special education services and nothing showing that the District failed to timely act.  Daniel's report cards reflected that he was making progress throughout the first and second grades.  His IST teacher noted increasing difficulties at the end of the second grade and in the first month of third grade the District conducted a second examination and report, determining that he was IDEA eligible.  The District then provided an IEP setting forth the services it would

offer to Daniel within thirty-days of that report.  I will therefore uphold the appeals panel decision that the District timely identified Daniel as IDEA eligible in September 2006.

### 2. The IEP Was Appropriate

The hearing officer found the District's proposed IEP was inadequate, holding "[t]he fundamental problem . . . is that it is a generic resource-room program rather than a plan designed to meet Daniel's unique needs as described in the School District's September 2006 [Evaluation Report]. . . .  [T]he IEP as a whole provides no assurance that the goals are designed to remediate Daniel's identified deficits in reading, math and written expression and systematically move him toward grade level in those basic skill areas."  Carroll Op. at 14.  The appeals panel disagreed, finding "[t]he goals in the IEP are measurable and are based on the needs found in the most recent [Evaluation Report].  The [Specially Designed Instruction] portion of the IEP are [sic]  numerous and specific to [Daniel's] needs."  Appeals Panel at 9.

The plaintiffs argue the appeals panel ignored the hearing officer's findings on the deficiencies of the IEP.  I must give due weight to the panel's decision, which does not reverse any credibility judgment on the part of the hearing officer.  The panel did not ignore the hearing officer's opinion, but rejected her reasoning.  For example, although the plaintiffs assert the panel ignored findings related to Daniel's anxiety, the panel explicitly rejected the hearing officer's finding related to Daniel's anxiety, stating it disagreed and setting forth its reasons supported by record evidence.  I discuss the panel's recognition of Daniel's anxiety and the evidence supporting the panel's decisions below, in the context of the plaintiffs' claim for tuition reimbursement.

After reviewing the record and giving due weight to the appeals panel, I will uphold the

panel's decision and find the District offered Daniel an appropriate IEP.

### D. Tuition Reimbursement

In general, the IDEA does not require the District "to pay for the cost of education . . . of a child with a disability at a private school or facility if [the District] made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 42 U.S.C. § 1412(a)(10)(C)(I).  Tuition reimbursement may be ordered, however, if the court "finds that [the District] had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id*. at § 1412(a)(10)(C)(ii).  Reimbursement "***may be*** reduced or denied" if either (1) at the most recent IEP meeting the parents did not inform the IEP Team that they were rejecting the proposed placement by "stating their concerns and their intent to enroll their child in a private school at public expense," or (2) the parents did not give "***written notice***" to the District at least 10 business days prior to removing the child from public school.  *Id.* at § 1412(a)(10)(C)(iii) (emphasis added).

#### 1. Notice

Daniel was withdrawn from the District twelve days before his IEP meeting and Daniel's mother conceded that she pulled Daniel from the school before informing anyone at the school of her intent to do so.  She further concedes that she did not provide written notice of her intent to seek reimbursement until nearly sixty days *after* withdrawing Daniel from the District.  Carroll Op. at 6.

The hearing officer found that "the District was well aware that Daniel's parents were considering private school" as of September when the private school requested Daniel's educational records and held "the District had ample time to consider whether an IEP team

meeting should be convened to develop a special education program for Daniel prior to his withdrawal from the District." *Id.* at 20-21. The appeals panel reversed, finding that "the Parent's did not follow the [required] steps before removing [Daniel] from the District and therefore could not be granted tuition reimbursement as set forth in the statute."

Even assuming the hearing officer's findings were based on credibility assessments that are owed deference, the appeals panel's contrary conclusion is justified by the requisite "non-testimonial, extrinsic evidence in the record." The elementary school principal testified that "we were aware approximately at the end of September that the family *was considering* Woodlyn[de] as an option." (N.T. 80 (emphasis added)). However, he further testified that it was not until the end of the IEP meeting held on October 25, 2006, more than ten days after Daniel's withdrawal from the District, that Daniel's parents first raised the issue of tuition support – and they did not do so in writing. (N.T. 81-82.) The hearing officer's finding that the District had "ample time" to convene an IEP meeting before Daniel's withdrawal from the District is directly contradicted by the record. The IEP meeting was scheduled for, and took place, within one month of the two evaluations that were conducted at the end of September, shortly after Daniel started the third grade.[2]

### 2. Exception

The IDEA does provide an exception for the notice requirement, allowing reimbursement without such notice at "the discretion of a court or a hearing officer" if compliance "would likely result in serious emotional harm to the child." 42 U.S.C. § 1412(a)(10)(C)(iv)(II)(bb). Here,

---

[2] The IEP meeting would have taken place earlier, but was delayed at the parents' request to accommodate their schedule. N.T. 82:7-11 (Testimony of principal Robert Clegg).

Daniel's mother claims he was pulled from school "because [she] was concerned for Daniel's emotional well-being." (N.T. 351.) The hearing officer noted that Daniel "reported a dream about asking to be killed which disturbed his mother and he had bouts of crying in school which resulted in a referral to the guidance counselor." Carroll Op. at 4.

The hearing officer applied the exception, finding "the record is replete with credible evidence that at the time Daniel left the District, he was suffering from worsening anxiety related to his school attendance." Carroll Op. at 20. In her discussion of the adequacies of Daniel's IEP, she found the District's proposed response to Daniel's demonstrated anxiety – to address his academic needs and to monitor his emotional state – "clearly inadequate." *Id*. at 17. She also found that it was "highly unlikely that Daniel's clear and increasing distress at being unable to keep up with his classmates academically would be instantly alleviated by assigning him to the resource room for approximately half of each school day" and that "[e]ven with the best possible specially designed instruction and support interventions in the regular classroom . . . he would be confronted on a daily basis with his inability to keep up with his classmates." *Id.* at 17-18.

The appeals panel held it was error to grant tuition reimbursement based on the "narrow exemption of serious emotional harm of the statute" and directly addressed Daniel's anxiety, disagreeing with the Hearing Officer's findings:

> The Parent's claim that [Daniel's] anxiety was school related, however, the District was not given the chance to implement its IEP therefore there was no chance to judge whether the plan would have reduced [Daniel's] anxiety as the Parent claims the private school has done. *There is no evidence in the record* that any special measures were taken at the private school, such as counseling, that would lead one to believe that the District program would not have had the same results in regards to [Daniel's] anxiety.

Appeals Panel Op. at 9 (emphasis added).

The panel's decision is well supported by the record. The parents' expert, Dr. Christine Madden, testified that Daniel's anxiety "was very definitely school related. He didn't seem to have difficulty in any other aspect of his life." (N.T. 454.) She further clarified that "[i]t was the anxiety of going off to school and the anxiety he felt during certain times when the demands were increasing on the areas in which he has difficulty that he would feel anxiety." (N.T. 468.) Daniel's school psychologist, Dr. Jennifer Hetzke, similarly testified that Daniel's anxiety was school-related, noting that "[t]he curriculum demands were shifting [at the beginning of third grade] and I think a lot of [the anxiety] was Daniel's response to this ever widening gap and his sense that he's not able to keep up with his peers. By providing him with instruction that's matched at his level, giving him the types of supports that a student with a learning disability would need, I think a lot of that would have addressed that anxiety as well." (N.T. 262.) She stated that Daniel's "anxiety is really that it was a response to academic demands that were too much for him. Modifying those demands, I think would have helped alleviate a lot of that for him on his own." (N.T. 263.)

Dr. Hetzke further testified that Daniel's IEP addressed his anxiety. She stated: "The hope was that this is a student whose anxiety is largely a response to academic demands. So, the thinking would be that the demeanor of the document is addressing those academic demands and trying to match his instructional level." (N.T. 288.) The school principal similarly testified that he believed the IEP addressed Daniel's anxiety by placing him in "a small group setting with like performing peers where his IEP would have targeted his instruction. I believe that would significantly reduce the reported levels of anxiety." (N.T. 88.)

Indeed, Daniel's mother testified that she believed Daniel's anxiety had reduced since he

enrolled in the private school "[b]ecause he's comfortable in his learning environment.  He feels successful in his learning environment.  He's in small groups.  He feels less intimidated."  (N.T. 377.)  The District's proposed IEP, as Daniel concedes in his complaint,  would have "provided a part time resource room placement to provide small group instruction in reading and math."  Compl. at ¶ 27.

Further supporting the appeals panel's finding is the evidence that Daniel's medication was a source of his anxiety.  Daniel's mother agreed that Daniel is better when he's on medication, and acknowledged that Daniel had intense headaches with the medication he was using in the beginning of his third grade year, while still in the District.  In the hearing officer's findings of fact related to Daniel's anxiety, she stated that he had adverse reactions to medications used to treat his ADD and "was just beginning a trial with a third medication." Carroll Op. at 4, ¶11.  Daniel's mother noted that he was better once his medication was switched, but even better once the dosage was increased –  all of which occurred after she withdrew Daniel from the District.  (N.T. 381, 384-85.)

Daniel did not meet the notice requirement for tuition reimbursement and I agree with the finding of the appeals panel that he did not meet the exception to this requirement.  The appeals panel's decision denying tuition reimbursement must be upheld.

## III.  CONCLUSION

The District recognized Daniel needed assistance in his very first year of school, provided remedial interventions, assigned an instructional support team, conducted an evaluation in the first grade determining that he had a specific learning disability, monitored his progress, and conducted a second evaluation at the beginning of the third grade to find him IDEA eligible.  The

15

appeals panel, giving proper deference to the hearing officer's findings and citing evidence where it disagreed, found that the District's determination of Daniel as IDEA eligible in September 2006 was timely. The panel also found the IEP was appropriate and therefore denied tuition reimbursement, noting the exception of "serious emotional harm" was not applicable. Having carefully reviewed the record and giving due weight to the panel's findings, I agree and will uphold the panel's decision in its entirety.

 An appropriate order follows.